## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

## STATE OF LOUISIANA

I, MADEL BUTLER Deputy Clerk of the Civil District Court, for the Parish of
Orleans, State of Louisiana, do herby certify that the within and foregoing 40 pages
constitute a *true and correct copy* of the *record* entitled:

*CASE NO:* 2007-6122          *DIVISION:* "H"

**ALLEN R. BOUDREAUX,
GENE R. CLOUATRE and
JAMES B. RUTLAND**

**VERSUS**

**DEUTSCHE BANK AG; DEUTSCHE BANK
SECURITIES, INC. d/b/a DEUTSCHE BANK
ALEX BROWN, a division of DEUTSCHE BANK
SECURITIES, INC., GRESHAM FINANCIAL
PARTNERS, WATERFORD CAPITAL
INVESTORS, AND GRAVIER FINANCIAL LTD.**

*IN TESTIMONY WHEREOF,* I have hereunto set

My hand and affixed the seal of said Court at New

Orleans, Louisiana, on this 18th day of

July ,2007.

**DEPUTY CLERK
CIVIL DISTRICT COURT CLERK'S OFFICE
421 LOYOLA AVENUE, ROOM 402
NEW ORLEANS, LOUISIANA 70112**

| | | |
|---|---|---|
| ALLEN R. BOUDREAUX, | * | DOCKET # |
| GENE R. CLOUATRE and | * | |
| JAMES B. RUTLAND | * | DIVISION |
| | * | |
| | * | CIVIL DISTRICT COURT |
| VERSUS | * | |
| | * | PARISH OF ORLEANS |
| DEUTSCHE BANK AG; DEUTSCHE BANK | * | |
| SECURITIES, INC. d/b/a DEUTSCHE BANK | * | STATE OF LOUISIANA |
| ALEX BROWN, a division of DEUTSCHE BANK | * | |
| SECURITIES, INC., GRESHAM FINANCIAL | * | |
| PARTNERS, WATERFORD CAPITAL | * | |
| INVESTORS, AND GRAVIER FINANCIAL LTD. | * | |
| | * | |

## PETITION FOR DAMAGES

Plaintiffs, Allen R. Boudreaux, Gene R. Clouatre, and James B. Rutland, bring this action

against Defendants Deutsche Bank AG; Deutsche Bank Securities, Inc. d/b/a Deutsche Bank

Alex Brown, a division of Deutsche Bank Securities, Inc., Gresham Financial Partners,

Waterford Capital Investors, Inc. and Gravier Financial, Ltd. (all defendants are sometimes

collectively referred to as the "Defendants") seeking damages for claims arising out of tax

strategies of the type further described herein, and state:

I.

## PARTIES

1.      Plaintiff, Allen R. Boudreaux, an individual and citizen of Louisiana, is of the

full age of majority and domiciled in the Parish of East Baton Rouge.

2.      Plaintiff, Gene R. Clouatre, an individual and citizen of Louisiana, is of the full

age of majority and domiciled in the Parish of East Baton Rouge.

3.      Plaintiff, James B. Rutland, an individual and citizen of Louisiana, is of the full

age of majority and domiciled in the Parish of East Baton Rouge.

4.      Upon information and belief, Defendant, Deutsche Bank AG (together with

Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown, "Deutsche Bank") is a German

Corporation with its principal place of business at Taunusanlage 12, 60325 Frankfurt am Main,

Germany, with an address in care of Deutsche Bank AG New York Branch at 31 West 52nd Street, New York, NY 10019.

5.      Upon information and belief, Defendant **Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown** (together with Deutsche AG, "Deutsche Bank") is a Delaware corporation with its principal place of business at 31 West 52nd Street, New York, New York, 10019.

6.      Upon information and belief, Defendant **ABC Insurance Company**, whose exact name is unknown at this time, had in force a policy of liability insurance providing coverage to the Deutsche Bank defendants for the damages claimed herein.  ABC Insurance Company is liable jointly and *in solido* for the damages to Plaintiffs caused by the Deutsche Bank defendants pursuant to Louisiana's direct action statute, LSA R.S. 22:655

7.      Upon information and belief, Defendant **DEI Insurance Company**, whose exact name is unknown at this time, had in force a policy of liability insurance providing excess coverage to Deutsche Bank defendants for the damages claimed herein.  DEI Insurance Company is liable jointly and *in solido* for the damages to Plaintiffs caused by the Deutsche Bank defendants pursuant to Louisiana's direct action statute, LSA R.S. 22:655.

8.      Upon information and belief, Defendant **Gresham Financial Partners,** a Louisiana Partnership, Tax Identification #36-4484027, with its principal place of business at 4209 Vincennes Place, New Orleans, LA 70125.

9.      Upon information and belief, Defendant **Waterford Capital Investors, Inc.,** a member of Gresham Financial Partners, is a Delaware Corporation.  The President of Waterford Capital is Kenneth A. Brown.

10.     Upon information and belief, Defendant **Gravier Financial Ltd.,** a member of Gresham Financial Partners, is a Delaware Corporation.  The President of Gravier Financial is Denise E. Davila.

## II.

## BACKGROUND FACTS

### A.   Introduction

11.     Plaintiffs bring this action against Deutsche Bank and Gresham Financial Partners

for their roles in soliciting and inducing Plaintiffs to participate in a tax strategy that the Federal government has found to be an unregistered tax shelter and to file tax returns premised on the assumption that the strategy was lawful even though the Defendants knew or should have known it would not be.

12.     Plaintiffs allege claims under RICO, as well as unjust enrichment, breach of fiduciary duty, fraud, negligent misrepresentation, breach of contract, and civil conspiracy. Plaintiffs seek disgorgement of the unethical, excessive, and illegal fees paid to the Defendants, plus compensation for all other damages sustained, including without limitation all fees and costs they have or will incur responding to the federal and state tax agencies as a result of the Defendants' actions, and any additional amounts, such as taxes, interest, and penalties, that may be assessed against them by the federal and state tax agencies, all of which damages must be trebled under RICO. Plaintiffs also seek all applicable attorneys' fees and costs incurred in this matter.

13.     Upon information and belief, the Defendants, along with current and former employees Jenkens and Gilchrist, ("J&G")[1] Gresham Financial Partners, and other intermediaries of Deutsche Bank entered into various arrangements amongst themselves to market and promote certain tax strategies to high net-worth individuals and business entities in order to generate fees that have been reported to exceed $250 million. Upon information and belief, the Defendants arranged to solicit high net-worth participants, like the Plaintiffs, who were induced to engage in these tax strategies and other transactions and pay the Defendants and their co-conspirators exorbitant fees by misrepresentations and advice that the Defendants knew or should have known were improper and illegal.

14.     Among other things, Deutsche Bank directly and/or through its intermediaries (which included Jenkens and Gilchrist and Gresham Financial Partners) colluded and induced the Plaintiffs to engage in these tax strategies by unequivocally representing that the tax strategies had been vetted by major law firms and were lawful, by representing that these same law firms would provide legal opinions that attested to that characterization, and by assuring Plaintiffs that

---

[1] Jenkens & Gilchrist and its current or former employees are not named as Defendants herein due to the pendency of an $81.55 million class settlement approved in the Southern District of New York and currently on appeal to the Second Circuit Court of Appeals.

the tax strategies provided protection against penalties that the tax authorities could assess in the unlikely event that they challenged the tax strategies' legitimacy. This use of these tax strategies has proven disastrous for the Plaintiffs, in that they have paid a significant amount of fees to the Defendants only to receive erroneous and incompetent advice that (a) has caused the Plaintiffs to pay substantial additional taxes, plus interest and penalties, (b) has prevented the Plaintiffs from availing themselves of legitimate tax opportunities and deductions, and (c) has caused the Plaintiffs to pay substantial amounts to legal and tax advisors to rectify the misconduct of the Defendants.

15.    As described in more detail below, the Defendants, either directly or through their intermediaries, abused their position of trust in order to generate exorbitant fees for themselves and their associates by marketing a scheme to reduce their clients' income taxes. To the contrary, the Defendants knew that the tax strategy they were marketing and promoting was similar to prior strategies found abusive by the IRS and, as a result, would be intensely scrutinized and likely regarded as a sham by the tax authorities.

16.    Finally, no securities were purchased or sold in connection with these transactions; rather, the Defendants caused the Plaintiffs to purchase so called Digital Options, which are nothing more than wagers that a certain commodity or equity will be at or beyond (or beneath) a given price on a certain date and time. Moreover, the fraud described in this Petition is strictly based on the unlawful misrepresentation utilized by the Defendants, directly or through intermediaries, to solicit the Plaintiffs into paying outrageous fees in exchange for arranging an unlawful and/or abusive tax strategy created, marketed, and promoted by the Defendants and/or their associates, and not the purchase or sale of securities.

**B.    The Development, Implementation, and Features of the Scheme to Sell Digital Options**

   **1.    About Deutsche Bank, Jenkens & Gilchrist,[2] and Gresham Financial Partners**

17.    Deutsche Bank, founded in 1870, is a joint stock company principally dedicated to financing foreign trade.[3] Deutsche Bank does business in major financial and banking

---

[2] Jenkens & Gilchrist and its current or former employees are not named as defendants herein due to the pendency of an $81.55 million class settlement approved in the Southern District of New York and currently on appeal to the Second Circuit Court of Appeals.
[3] All of the information set forth in this section is taken from the website of Deutsche Bank. *See* <http://www.db.com/> *Deutsche Bank at a glance* (last visited March 26, 2007);

markets in Germany, Europe and the rest of the world; and, as of December 31, 2005 had total assets of approximately $1.32 trillion and revenues and net income in December 31, 2005 of approximately $341 billion and $47 billion, respectively.  Deutsche Bank offers various investment, financial and related products and services to consumer and corporate clients worldwide.  Deutsche Bank has over 71,000 employees and more than 1.3 million customers in 73 countries worldwide; more than half of Deutsche Bank's staff works outside of Germany.

18.     Deutsche Bank claims to provide its private clients with all-round service extending from account-keeping and cash and securities investment advice to asset management. In addition, Deutsche Bank claims to have a leading position in international foreign exchange, fixed-income and equities trading.

19.     Deutsche Bank holds itself out to be a pre-eminent provider of liquidity in the world's foreign exchange markets and a recognized leader in all aspects of foreign exchange. According to its website, it is consistently ranked as one of the top three global foreign exchange providers by *Euromoney* Magazine's industry standard annual Foreign Exchange Poll, both in terms of client perception and market share.

20.     Deutsche Bank's Foreign Exchange claims to be committed to the core values of client focus and innovation that allegedly characterize all its wholesale client businesses.  It emphasizes its ability to find the most creative solution available to "individual" client problems.

21.     At the time of the events in question, Jenkens & Gilchrist, P.C. was a large law firm with over six hundred (600) attorneys and offices in nine (9) major cities throughout the United States.  It claims expertise in a variety of industries and market segments, including Bankruptcy, Construction, Corporate & Securities, Financial Institutions, Financial Services, Foreign Investment, Estate Planning, Health, International Tax, Intellectual Property, International Tax, Technology, Real Estate, and White Collar Law.

22.     Gresham Financial Partners is a Louisiana general partnership who participated into purchases (more fully explained in later sections of this complaint) with each of the Plaintiffs in this Complaint.  Upon information and belief, this Louisiana general partnership is

---

<http://www.jenkens.com/jenkens/aboutjenkens.asp>*About Jenkens* (last visited March 26, 2007);
<http://jpmorganchase.com> *About JP Morgan Chase & Co.* (last visited March 26, 2007)

represented by Kenneth A. Brown, President of Waterford Capital Investors, Inc., which as a member of Gresham Financial Partners, hold a 50% interest in the Louisiana general partnership. Upon information and belief, Gresham Financial Partners is also represented by Denise E. Davila, president of Gravier Financial Ltd., which as a member of Gresham Financial Partners, holds a 50% interest in the Louisiana general partnership.

**2.   About Digital Options**

23.   An option gives a buyer the right to buy or sell "something" at a definite price for a definite period of time, regardless of that something's then market price on the open market. That "something" may be stock, bonds, commodities, or intangible market valuations such as the Standard and Poors (the "S&P") composite value. Options are said to be "in the money" if the price of the underlying "something" makes exercising the option profitable. Similarly, options are said to be "out of the money" when exercising the option would result in no gain or loss. Although options were originally primarily developed as a "hedge" against declines in other investments, "plain vanilla" options have spawned a host of derivatives which sometimes only hang by a slender thread from any underlying investment or in some cases – like here – not at all.

24.   Options may be either "American-style" or "European-style," depending upon when the option purchaser has the right to exercise the option at any time before expiration or only upon the designated expiration date. For example, assume an investor buys a "call" option on 1000 shares of ABC stock with a "strike price" of $100 and an expiration date of July 16, 2006. This option gives that investor the right to purchase 1000 shares of ABC stock for $100. Under an American-style option, the option holder can exercise the option by purchasing the shares at any time he chooses prior to July 16, 2006. Under a European-style option, the option holder can only elect to exercise the option on July 16, 2006, and perhaps, as was true in this case, only at a certain time on that date.

25.   Digital Options are "digital" in the sense that the investor wins or loses a pre-determined amount in full, but only if the strike price is met – thus, the option is either on or off, like a digital (binary) 1 or 0. As a result, Digital Options provide an investor with the same payout no matter how far above the strike price the underlying price goes. For example, a Digital Option may look as follows: an investor will receive $1,000 if ABC Corp. closes at or

above $12 per share on June 24, 2006. If the price of ABC Corp. is at or above $12 per share on the closing date, the investor is paid $1000. If ABC does not close at or above $12 share, the investor gets nothing and loses what he originally paid for the option. No matter the outcome, however, stock in ABC Corp. never changes hands. Digital Options are, in reality, nothing more than wagers that a certain commodity or equity price will be at or beyond (or beneath) a given price on a certain date.

26.     Digital Options are ordinarily less expensive to purchase than standard options. A Digital Option price is influenced by many of the same factors as any other option, such as the price of the underlying commodity, the exercise price, the time to maturity, the volatility of the underlying commodity, and short-term interest rates. A key disadvantage of Digital Options is a limited profit potential.

### 3.   Defendants Develop the Plan to Market the Foreign Exchange Contracts

27.     Upon information and belief, the plan to market the foreign exchange digital options (the "FX Contracts") was developed in the mid to late 1990s by individuals at Deutsche Bank and Paul Daugerdas,[4] who has a professional and social relationship with several Deutsche Bank executives for many years prior thereto. Upon information and belief, prior to 1994, Daugerdas was employed by Arthur Anderson as, *inter alia,* the Partner in charge of Futures and Options Tax Practice. Upon information and belief, from 1994 to December 28, 1998, he was a partner at the law firm of Altheimer & Gray in Chicago, Illinois, where he was Chairman of its Tax Department. During the time when the Plaintiffs were solicited for the tax shelter scheme, Daugerdas had been a partner in Jenkens and Gilchrist's Chicago office.

28.     Upon information and belief, from 1991 until October 1999, Daugerdas apparently marketed a tax strategy in which a prospective client would borrow a treasury security, sells the security short, and then contribute the proceeds to a partnership in exchange for a partnership interest. Upon information and belief, after the House Ways and Means Committee of the United State Congress proposed legislation in October of 1999 that would, if

---

[4] Because Paul Daugerdas is a current or former employee of Jenkens and Gilchrist, he is not named as a defendant herein due to the pendency of an $81.55 million class settlement approved in the Southern District of New York and currently on appeal to the Second Circuit Court of Appeals.

passed, adversely impact the use of treasuries in the short-sale strategy, Daugerdas began to employ the option strategy for his clients.

29.     The result was a tax strategy where a taxpayer purchases and writes options and transfers these option positions to a partnership.  As a result, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of the purchased options, but is not reduced by the taxpayer's obligation with regard to the options written.  The use of European-style digital options in this transaction is essential because it permits significant leverage to be obtained at a relatively modest and minimum risk.

30.     To hold the risk and the resulting profit potential to a minimum, the FX Contracts were essentially structured as follows:  Each client entered into two opposing transactions[5] - one where the client would be **PAID** if the spot rate on a particular currency[6] was at or above a certain rate, and one where the client would have to **PAY OUT** if the spot rate was at or above a certain rate.  The two rates that were set (one where the client would be PAID and one where the client would PAY OUT) were different by amounts less than one cent.  On all of the FX Contracts, the trigger (i.e. the event which causes a payoff) occurred when the spot rate on the underlying currency (e.g. Japanese Yen vs. U.S. Dollar, Euro vs. U.S. Dollar, or Canadian Dollar v. U.S. Dollar) was at or above a specific spot rate on a certain date at a certain time.  Thus, there was almost no chance of only one position being acted upon.  Either the spot would be above both, so both were acted upon, or the spot rate would be below both, so neither was acted upon.

31.     To further ensure control of the transaction, (that either both or neither one were acted upon) the ability to determine when and if the event was triggered, was retained by Deutsche Bank, with the stipulation that Deutsche Bank, as the "calculation agent," could choose to accept or disregard any spot rate.  When these two elements are combined – *i.e.* the incredibly close proximity of the trigger spot rates (hundredths of a penny apart) and the ability to choose

---

[5] Upon information and belief, the two transactions, although purportedly independent, were actually not independent.  Each client and Deutsche Bank entered into a contract memorializing both what was bought and what was sold, but to which the client could not transfer the positions separately.  Further, the FX Contracts were not something traded on any recognized exchange but were simply a matter or private contract between the participants.  Finally neither party would ever take possession of the "underlying currency."  As a result, the FX Contracts amounted, in actuality, to a contractual wager (i.e., a "bet") based on movements in foreign currency prices, without any real possibility of foreign currency ever changing hands between the parties.
[6] Foreign currency was used so that the loss claimed could be either capital or ordinary, depending on the need, under §988 of the Internal Revenue Code.

the spot rate that determines if the trigger occurred – the transactions had virtually no risk of just one of the paired transactions being exercised.

32.     Upon information and belief, the FX Contracts were structured so that the total of fees was up to nine and one-half percent (9.5%) of the tax savings that each client desired to achieve. Of this amount, up to five percent (5%) went to Deutsche Bank as the "spread" between the two positions in the FX Contract (*i.e.* the difference between what was paid for buying one position and what was received for selling the other).

33.     In the instant case, Deutsche Bank designed and sold the FX Contracts while using companies the Plaintiffs could trust and confide to actually sell the tax strategy to the Plaintiffs.

34.     The Plaintiffs entered into the FX Contracts. The options expired "out of money," thus allowing Deutsche Bank to retain premiums it has received on the FX Contracts.

35.     In the instant case, to the extent that the Plaintiffs are aware, Deutsche Bank received the following amounts from the Plaintiffs: 4.88% of the total fees paid by Plaintiff Rutland, or $125,000; 4.91% of the total fees paid by Plaintiff Boudreaux, or $87,500; and, 4.93% of the total fees paid by Plaintiff Clouatre or $75,000.

36.     Upon information and belief, Gresham Financial Partners played an integral part in the facilitation of this tax scheme. The Plaintiffs entered into contracts with Deutsche Bank and Gresham Financial Partners, which included a December 7, 2001 "Memorandum of Sale to Gresham Financial Partners" of interests in an Illinois Trust which was created on November 2, 2001. The agreement involved the Plaintiff(s) as Seller(s)[7], Gresham Financial Partners as Buyer, and Deutsche Bank as creditor. The details of this transaction are more fully described in paragraph 53 of this Petition under the subsection titled "Features of the Strategy."

37.     Defendants, singly and in concert with its intermediaries engaged in a common plan, transaction and course of conduct described herein in connection with the purchase and sale of the FX Contracts, pursuant to which they knowingly and recklessly engaged in acts, transactions, practices, and a course of business which operated as fraud upon the Plaintiffs.

---

[7] Each Plaintiff entered into identical "Memorandums of Sale to Gresham Financial Partners" with each parties role more fully described in Paragraph 53 of this Petition under the subsection titled "Features of the Strategy."

Further, the Defendants made various false statements of material fact and omitted to state material facts which made such statements misleading to the Plaintiffs.

38.    The purpose and effect of the Defendants' plan, transaction, and course of conduct was to generate huge fees by convincing the Plaintiffs to engage in these FX Contracts as part of the alleged tax-savings strategy.

39.    Defendants either had actual knowledge of the misrepresentation and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.  In this regard, Defendants' acts and omissions included, *inter alia:*

- Failing to disclose to the Plaintiffs the true likelihood that the FX Contracts would pay out;

- Failing to disclose to the Plaintiffs that the Defendants retained virtually unlimited discretion to determine whether the FX Contracts would pay out and therefore, could ensure, if they so chose, that the FX Contracts would not pay out;

- Failing to apprise the Plaintiffs that the FX Contracts had no reasonable possibility of a profit (certainly not in excess of the fees paid), and that, in reality, the net effect of the options they were purchasing and selling was not more than a wager on where the price of the underlying currency would be at exactly a certain time.

- Failing to disclose to the Plaintiffs that this strategy was designed and created by Defendants, Jenkens and Gilchrist and others.

40.    As a result of and in reliance on these misrepresentations, omissions, and promises, the Plaintiffs purchased the FX Contracts and engaged in the strategies at issue.

41.    Had the Plaintiffs known of the material adverse information which Defendants did not disclose, they would not have purchased the FX Contracts or engaged in the strategies.

42.    The Defendants owed duties to the Plaintiffs.  These duties included the duty to:

- Exercise prudence, caution, and care in recommending and entering into FX Contracts for and with the Plaintiffs; and

- Exercise their responsibility to deal fairly and in good faith and their fiduciary responsibilities of care and loyalty to the Plaintiffs.

43.     The Defendants chose to defraud the Plaintiffs for personal gain in the form of outrageous fees from unsuspecting clients.  These transactions to defraud were perpetrated through the Defendants' discrete acts of misrepresentation.

**4.   The Enterprise is Formed and the Scheme is Put in Action**

44.     Upon information and belief, Deutsche Bank recruited other companies as marketing participants to assist them in marketing the tax strategies at issue.

45.     Deutsche Bank recruited these intermediaries to sell the strategies because they knew people, like the Plaintiffs, would more likely trust companies to which they already do business.  As a result, the Defendants knew that if these companies recommended the tax strategies to their wealthy clients, the clients would more than likely go through with the deal.

46.     Potential wealthy clients, like the Plaintiffs in the instant case, were identified and meetings were set up to discuss the transaction.  Knowing they could capitalize on the close relationship with their respective clients, one of the "marketing participants" gave the Plaintiffs a sales presentation.  The crux of the sales pitch was that a major law firm (*i.e.* Jenkens and Gilchrist) would prepare an "independent" opinion letter confirming the propriety of the tax strategies, which would supposedly provide insurance in the event of an audit.

47.     The chief, if not only, goal of the Defendants was to make money and the best interests of their clients (the "targets") were secondary at best.  Upon information and belief, the Defendants and its intermediaries entered into an arrangement where each would receive a certain portion of the fee for each transaction sold, and Deutsche Bank would receive at least the premium under the FX Contracts.

48.     Upon information and belief, Paul Daugerdas and other employees and Jenkens and Gilchrist prepared an opinion letter as to the propriety of its strategies long before clients were solicited.  Upon information and belief, the opinion letter was a "canned," "prefabricated" form that was utilized, with minor changes based on the particular client, for each and every strategy sold across the country.

49.     Based on information and belief, the Defendants were participants of a scheme which involved a well-planned sales strategy that focused on leveraging trust and confidence, couple with pressure as needed, to sell the strategies on trusting clients.  Potential wealthy clients

were identified and meetings were set up to discuss the strategies. Sales presentations were held. The crux of the sales pitch was that a major law firm, Jenkens and Gilchrist, would prepare an "independent" opinion letter confirming the propriety of the strategies, which would supposedly provide "insurance" in the event of an audit.

### 5.   The Plaintiffs are Solicited

50.    In early 2001, the Plaintiffs recognized their share of a multi-million dollar capital gain as a result of the sale of a power plant project owned by a limited liability company in which they were members. In July or August of 2001, without solicitation, the Plaintiffs were approached by a "marketing participant" of the Deutsche Bank tax shelter scheme after learning of the large capital gain of the Plaintiffs. The Plaintiffs were told of a completely legitimate and legal tax strategy involving purchases of foreign digital options that with the aid of Deutsche Bank could guarantee elimination of their tax liability. The Plaintiffs asked several times about the legality of the tax strategy and were assured each time that the strategy was perfectly legal. The Plaintiffs completely trusted these representations since the Plaintiffs had done business with the marketing participant for many years. To further bolster this confidence, the Plaintiffs were told that they would receive an independent legal opinion form a reputable law firm, Jenkens & Gilchrist, that would insulate the Plaintiffs from any liability in the event the IRS were to perform an audit.

51.    Based on the professional weight and public reputations of Deutsche Bank, Jenkens and Gilchrist and other participants, the Plaintiffs agreed to engage in the tax strategies.

52.    The Defendants never told the Plaintiffs that the strategies were actually, in part, created, designed, and would be implemented collectively by Deutsche Bank, Gresham Financial Partners, Jenkens and Gilchrist, and other participants in the tax scheme. The Plaintiffs were never made aware that Jenkens and Gilchrist was providing a legal opinion as to the validity of a tax shelter strategy it collaborated with the Defendants, which as a result was not in fact an "independent" opinion letter.

### 6.   The Features of the Strategies

53.    The strategy which was promoted to the Plaintiffs and in which the Plaintiffs ultimately became engaged was referred to as "HOMER" (Hedge Option Monetization of

Economic Remainder) and involved the following (which occurred on or about the following dates):

- I.  [11/19/01] First, the Plaintiff(s), ["Client(s)"], buy(s) four European-style Options (*i.e.* an option exercisable only at its expiration) by financing the purchase through a Loan with Deutsche Bank[8]

- II.  [11/23/01] The Client then contributes the options to a Grantor Unitrust, and a small unitrust amount is donated to one of the other clients, and the Client retains the remainder interest.  The trust allows the Client to substitute trust assets (options) with assets of equal value (which would allow the Client to reacquire the options).  The client then secures the Loan with remainder interest.

- III.  [12/7/01] The Memorandum of Sale to Gresham Financial Partners is executed. The Client sells the remainder interest to a third party ["Partnership" - Gresham Financial Partners ("Gresham")] at fair market value, which should roughly equal to the loan.  The Client then takes a Note back from the Partnership for the "purchase price."  Deutsche Bank, as creditor in this Memorandum of Sale, actively participated in this transaction facilitating the sale between Client and Gresham Financial Partners.

- IV.  The Note from the Partnership, Gresham, is then pledged as collateral on the Loan to Deutsche Bank and Deutsche Bank releases the options as collateral.

- V.  [12/13/01] Options B & C Expire (the larger of the two put options and the smaller of the two call options)

- VI.  [12/14/01] Gresham, the Partnership, then acquires the unitrust interest from the unitrust beneficiary.

---

[8] Options A and C are put options (A is reset bonus knock-out and C is reset bonus knock-in.).
These amounts are from one Plaintiff Gene R. Cloustre's transaction.

| Option | Strike Price | Cap | Reset Strike Price | Knock-out Barrier | Knock-in Barrier | Premium |
|--------|-------------|------|-------------------|-------------------|------------------|---------|
| A (Put)  | 0.971  | 0.7945 | 0.9065 | 0.88  | N/A  | $2,967,030 |
| B (Call) | 0.7945 | 0.971  | 0.9065 | 0.88  | N/A  | $3,033,030 |
| C (Put)  | 0.971  | 0.7945 | 0.9065 | N/A   | 0.88 | $2,972,970 |
| D(Call)  | 0.7945 | 0.971  | 0.9065 | N/A   | 0.88 | $3,026,970 |

The "strike price" is quite simply the set price at which the option may be exercised
The "knock-out barrier" is the price at which the option is terminated, should the stock/currency trade at the barrier price.  Conversely, the "knock-in barrier" is the price at which the option commences, should the stock/currency trade at the barrier price.  Notice that these options periods are very short (30 days or less).  It appears that the "call options" were with respect to the Euro, and the "put options" were with respect to the U.S. Dollar.

- VII. [12/14/01] The trust is terminated and the assets (the remaining unexpired options) are distributed to Gresham, the Partnership (which is now the sole beneficiary).

- VIII. [12/17/01] The Partnership, Gresham, liquidates, the (corporate) partners assume the Note (pledged as collateral to Deutsche Bank) and also receive the remaining unexpired options.

- IX. [12/17/01] Options A & D expire. (the smaller of the two put options and the larger of the two call options) However, now, the Client is no longer the owner of the options.

- X. [12/21/01] The (corporate) partners pay the Note due the Client and the Client pays Deutsche Bank.

- Upon information and belief, Deutsche Bank and Gresham Financial Partners and its members Waterford Capital Investors and Gravier Financial Ltd. played an integral part in facilitating these transactions.

54.     Each of the steps proposed to Plaintiffs, acting pursuant to an undisclosed arrangement between the Defendants, Jenkens and Gilchrist and others, were to be planned in advance to reduce or eliminate tax liability for the Plaintiffs' substantial capital gains.

55.     The Plaintiffs were further advised that if the IRS audited their tax returns as a result of the strategies, the Jenkens and Gilchrist "independent" opinion letter would confirm the propriety of the strategies and of claiming the resulting losses on their tax returns. This "independent" opinion letter would enable the Plaintiffs to satisfy the IRS auditors as to the propriety of the tax returns. These "canned" and "prefabricated" opinion letters approving the strategies had already been prepared and needed only to fill in the blanks for each particular client.

56.     The Plaintiffs were advised that the capital and ordinary losses created by these tax strategies were legitimate and in accordance with all applicable tax laws, rules, and regulations.

C.   **IRS NOTICE 1999-59:  Transactions Lacking in "Economic Substance" are Illegal.**

57.   On December 27, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax

Avoidance Using Distribution of Encumbered Property."  In this Notice, the IRS stated:

> The Internal Revenue Service and Treasury Department have
> become aware of certain types of transactions, as described below,
> that are being marketed to taxpayers for the purpose of generating
> tax losses.  This notice is being issued to alert taxpayers and their
> representatives that the purported losses arising from such
> transactions are not properly allowable for Federal income tax
> purposes…Through a series of contrived steps, taxpayers claim tax
> losses for capital outlays that they have in fact recovered.  Such
> artificial losses are not allowable for Federal income tax purposes.

The message from the IRS to entities, such as the Defendants, was that purported losses arising

from transaction wholly lacking in "economic substance" are not properly allowable for Federal

income tax purposes.  The Plaintiffs were never made aware of the effect and significance of this

IRS Notice on the tax strategies.

58.   As a result of Notice 1999-59, the Defendants knew or certainly should have

known that the IRS would assert that the purported losses arising from their tax strategies were

improper and not allowable for tax purposes; however, upon on information and belief, the

Defendants intentionally did not disclose to the Plaintiffs.

D.   **IRS Notice 2000-44:  The IRS Contends that the Strategies are Illegal.**

59.   On August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance

Using Artificially High Basis."  The notice concerned "similar transactions to those described in

Notice 1999-59 that purport to generate tax losses for taxpayers," thus indicating the IRS

believed it had also addressed transactions like the strategies described herein in Notice 1999-59.

60.   Most importantly, Notice 2000-44 specified the precise transaction and/or scheme

marketed to Plaintiffs, under which the taxpayer purchases call options and simultaneously

writes offsetting call options, then transfers the option positions to a partnership, and ultimately

claims that the basis in his partnership interest "is increased by the cost of the purchased call

options but is not reduced under Internal Revenue Code §752 as a result of the partnership's

assumptions of the taxpayer's obligation."  The IRS states, "The purported losses from these

transactions (and from any similar arrangements designed to produce non-economic tax losses by

artificially overstating basis in partnership interest) are not allowable as deductions for Federal

income tax purposes." The clear message from the IRS to the Defendants was that the purported

losses arising from these strategies are not properly allowable for Federal income tax purposes.

The Defendants, however, simply ignored the IRS and this Notice to the detriment of the

Plaintiffs.

61.     The Defendants represented that the strategies at issue herein were legal tax

shelters despite the fact that IRS Notices 1999-59 and 2000-44 expressly and unequivocally

stated that the type of transaction the Plaintiffs undertook was illegal. The Defendants simply

ignored the clearly stated implications of IRS Notices 1999-59 and 2000-44 and, therefore,

knowingly deceived and misled the Plaintiffs to their detriment.

62.     Deutsche Bank, through collusion with Jenkens and Gilchrist, Gresham Financial

Partners, and its other intermediaries actually promoted and implemented the strategies after

issuance of Notice 2000-44 which expressly stated that these transactions were illegal and

invalid. Unfortunately, neither Deutsche Bank nor Gresham Financial Partners disclosed this

important development to the Plaintiffs. Clearly, the Defendants placed their greed over the

Plaintiff's best interest.

63.     On May 24, 2004, in furtherance of its previous pronouncements, the IRS

released Announcement 2004-46 which offered to "settle" with the Plaintiffs and other like-

situated taxpayers by those parties paying to the IRS (a) all of the taxes avoided by use of these

transactions, (b) all interest due, (c) a 10% penalty, and (d) a loss of 50% of the fees and other

"out of pocket" costs deducted. If taxpayers did not accept this offer, then the IRS indicated they

would be assessed all tax and interest, lose all deductions, and be assessed a 40% penalty.

E.     The Cost of the Strategies.

64.     The Plaintiffs lost a significant amount of money in carrying out the strategies at

issue. For the strategies and tax returns in connection therewith, the Plaintiffs paid fees to the

Defendants and others participants of the scheme an amount of at least $1.4 Million Dollars.

65.     The Plaintiffs also incurred and are continuing to incur significant legal,

accounting, and other advisory fees in connection with rectifying the wrongs that have been

perpetrated against them.

## III.

### FIRST CAUSE OF ACTION

### CIVIL VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

66.     The Plaintiffs repeat and reallege each and every prior allegation as if fully set forth herein.

67.     Each of the Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c).

68.     At all times relevant hereto, each of the Plaintiffs and Defendants were "persons" within the meaning of 18 U.S.C. §1961(3).

#### The RICO Enterprise

69.     An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

70.     The enterprise at issue in this case, for purposes of 18 U.S.C. §§1961(3) and 1962(a), 1962(b), 1962(c), and 1962(d), is an association-in-fact of all Defendants and non-defendant co-conspirators referred to herein as the "Enterprise." Additional wrongdoers that may be part of the association-in-fact enterprise (sometimes referred to herein as "Member" or "Members") include the individual Defendants themselves, those employees and agents of the Defendants, intermediaries acting on behalf of the Defendants, and other non-defendant entities or co-conspirators that participated in the fraudulent representations to the Plaintiffs, the public, the courts, and various regulatory and enforcement agencies, including several other law firms and accounting firms.

71.     While the Defendants participated in the Enterprise and were a part of it, the Defendants also have an existence separate and distinct from the Enterprise.

72.     Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

73.     Defendants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme.

74. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

75. Defendants and all other Members of the Enterprise worked together to orchestrate the pursuit of client prospects; the promotion and the sale of tax strategies; and shared fees, costs, information, resources, and the fruits of its predicate acts. The association-in-fact enterprise, Defendants and other Members of the Enterprise, was a formal, ongoing relationship which functioned as a continuing unit, pursuing a course of conduct as set forth above (*i.e.* the pursuit of customer prospects, the promotion and the sale of the series of tax strategies, regardless of what those strategies entailed), with a common or shared purpose (*i.e.* to convince potential clients to allow it to attempt to eliminate those clients' tax liabilities, all the while charging exorbitant fees) and continuity of structure and personnel.

76. Defendants and those employed by and/or associated with the Enterprise, which engaged in interstate commerce, have conducted the affairs of the Enterprise though a pattern of racketeering activity in violation of 18 U.S.C. §§1962(a) and (b), and have conspired to violate §1962(c) in violation of §1962(d) by designing, creating, engineering, implementing, and/or selling and inducing the purchase of transactions which were designed to reduce or eliminate tax liability and which have been determined by the IRS to be illegal and/or abusive tax shelters under IRS Notice 1999-59, IRS Notice 2000-44, and IRS Announcement 2004-46, and/or other IRS Notices or Announcements.

77. All Defendants have violated 18 U.S.C. §1962(d), inasmuch as they knowingly, intentionally, and unlawfully, aided and abetted each other, conspired to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, through the pattern of racketeering activity described herein.

### The Defendants' Scheme

78. For a substantial period of time, the Defendants knowingly, intentionally and directly participated in, or aided and abetted, counseled, commanded, induced, procured or caused and conspired in the pursuit and solicitation of an eventual inducement of clients to participate in tax strategies which were designed to reduce or eliminate tax liability for their clients, either directly or through their intermediaries, by means of false or fraudulent

representations or promises by the use of the mails and/or wires for purposes of the execution of their scheme. In furtherance of their scheme, the Defendants failed to reveal to the Plaintiffs the number of other participants that were pursued and solicited by the Enterprise for placement into, and that actually were induced to participate in, these same or similar tax strategies which the Enterprise knew, should have known, and was in the best position to know likely would not withstand the challenge and/or scrutiny of the IRS. Upon information and belief, this was not a single scheme intended to induce one sole victim to do anything; the Members of the Enterprise schemed to pursue and solicit several hundred, if not more than a thousand, victims.

79.     The Enterprise never fully disclosed the risks or clearly articulated the nature of the transactions to the Plaintiffs. Moreover, the Enterprise failed to even provide the tax legal opinions until *after* the Plaintiffs had paid over a million dollars in fees for those opinions.

### Predicate Acts

80.     With respect to the activities alleged herein, the Enterprise acted at all times with malice toward the Plaintiffs, with the intent to engage in the conduct complained of for the monetary benefit of the Defendants and the Enterprise. Such conduct was done with actionable wantonness and reckless disregard for the rights of the Plaintiffs. These predicate acts were acts of deception which furthered the goal of soliciting clients to participate in what the Enterprise knew or should have known was fraudulent and would be deemed abusive and/or illegal by the IRS. Specifically, the Enterprise knew that certain of its strategies had been deemed abusive by the IRS and that the "new" strategies that they were promoting were not different enough to survive inspection or investigation by the IRS.

81.     With respect to the activities alleged herein, the Enterprise was seeking to aid and abet and was aiding and abetting a transaction to violate 18 U.S.C. §1962(a), (b) and (c). Each member of the Enterprise agreed to interfere with, obstruct, delay, or affect interstate commerce by attempting to obtain and/or actually obtaining fees to which the Enterprise was not entitled.

82.     With respect to the overt acts and activities alleged herein, each Member of the Enterprise conspired with each other non-defendant entity or co-conspirator to violate 18 U.S.C. §1962(a), (b) and (c), all in violation of 18 U.S.C. §1962(d). In violation of §1962(c), each Member of the Enterprise agreed and conspired with each other Member, including others not

named as Defendants in this matter to, pursuant to §1962 (b), acquire or maintain property interests to which the Enterprise was not entitled through its racketeering activity by charging exorbitant fees for tax strategies it knew or should have known would likely be deemed unacceptable by the IRS.

83.    The Enterprise and its individual Members exceeded any legitimate role of diligent tax advisors by designing, creating, engineering, implementing, marketing, promoting and/or selling a series of tax strategies in an attempt to conspire to obtain money in the form of fees and commissions, knowing that the underlying strategies were likely not defensible to the IRS. Upon information and belief, the Enterprise participated in some of these transactions via partnerships that it formed to make the strategies perform. Many of these tax strategies have been deemed illegal and/or abusive pursuant to IRS Regulations, Notices and Announcements.

84.    The Enterprise's schemes have resulted in severe financial and business losses to the Plaintiffs. Moreover, as a result of the Enterprise's wire fraud and mail fraud violations, the Plaintiffs have suffered extensive monetary damages consisting of unexpected tax liability, fees and commissions paid to the Enterprise, as well as interest and penalties paid to the Internal Revenue Service. The Plaintiffs have also suffered additional damages including, but not limited to, lost opportunity costs, additional legal, tax advisor, and accountant fees and reputation damage.

85.    The Enterprise's documents and communication associated with the schemes at issue contained false and/or misleading representations, including but not limited to assertions that:

a.    No penalties would or could be assessed by the IRS or state taxing authorities because the transaction's unique characteristics and the opinion itself provided complete "penalty protection."

b.    An independent third party would review and advise the Plaintiffs as to the tax strategy's legitimacy.

c.    Due to the underlying defensibility of the opinion to the Plaintiffs and the litigation risk to the IRS, the Plaintiffs would not have to pay interest or penalties.

86.   These misrepresentations constitute "false or fraudulent pretenses, representations or promises" within the meaning of the mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C. §1343) provisions.

87.   All of the Members of the Enterprise actively participated in this elaborate and abusive scheme to obtain money from the Plaintiffs, even those not named as defendants in this matter.

88.   The numerous predicate acts of mail and wire fraud described herein are part of separate fraudulent transactions by the Enterprise designed to defraud the Plaintiffs of money and property interests under false pretenses.  As the victim of these unlawful patterns of illegal behavior, the Plaintiffs have continued to suffer losses.

89.   In carrying out the overt acts and fraudulent transactions described herein, the Defendants engaged in conduct in violation of various state and federal laws and regulations, including but not limited to 18 U.S.C. §§1341, 1343, 1346, and 1961 *et seq*, and both state and federal banking laws.

90.   18 U.S.C. 1961 (1) provides that "racketeering activity means any act indictable under any of the following provisions of Title 18, United States Code:  §1341 (relating to mail fraud), §1343 (relating to wire fraud), and §1346 (relating to scheme or artifice to defraud).

<u>Violations of 18 U.S.C. Sections 1341 and 1343</u>

91.   For the purpose of executing and/or attempting to execute its transaction to defraud and obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories for mail, matter and things to be sent or delivered by the United States Postal Service and received matter and things therefrom including but not limited to contracts, instructions, correspondence, opinion letters, and other items.

92.   For the purpose of executing and/or attempting to execute its transaction to defraud and obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. §1343, transmitted and received by wire, matter and things therefrom, including but not limited to contracts, instructions, correspondence, opinion letters, funds and other things.

93.     The Enterprise's use of the mails and wires included private and public components.

94.     The Enterprise utilized the U.S. Mail and wire to communicate among themselves, as well as with its co-conspirators and its clients. While the Plaintiffs were located in Louisiana during the implementation of the scheme at issue, some members of the Enterprise were located in Illinois, while others were located elsewhere. In order to carry out and implement its scheme, the Enterprise necessarily had to communicate by the mails and wires.

95.     In those matters and things sent or delivered by the United States Postal Service, by wire and through other interstate electronic media, the Enterprise falsely and fraudulently misrepresented and fraudulently suppressed material facts from the Plaintiffs, in violation of 18 U.S.C. §§1341 and 1343, including but not limited to the following:

a.      Misrepresenting the proposed transactions as unique and/or distinct from those previously declared abusive and/or illegal by the Internal Revenue Service;

b.      Falsely claiming that the transactions and the to-be-received tax opinions would protect the taxpayers from any tax penalties;

c.      Misrepresenting the likelihood that the taxpayers would prevail should a dispute arise with taxing authorities;

d.      Failing to disclose the true likelihood that the IRS would not accept the tax treatment of these transaction as indicated in the opinion letters, based on the transactions' similarity to other transaction that had been deemed abusive and/or illegal.

e.      Failing to disclose that the IRS had previously issued official notices and announcements deeming substantially similar tax strategies to be abusive and/or illegal;

96.     The Enterprise intentionally and knowingly made these representations and intentionally and knowingly suppressed material facts from the Plaintiffs for the purpose of deceiving them and thereby obtaining financial gain. The Enterprise either knew, should have known, or recklessly disregarded that the misrepresentations and omissions described herein were material. The Plaintiffs justifiably relied on the misrepresentations and omissions in carrying out the transactions and in subsequently filing its tax returns.

**Pattern of Racketeering Activity**

97.     The violations set forth herein constitute "racketeering activities" or "predicate

acts" within the meaning of 18 U.S.C. §1961(1), and include but are not limited to:

a.      Failing to disclose the true likelihood that the IRS would not accept the tax

treatment of these transaction as indicated in the opinion letters, based on the transactions'

similarity to other transaction that had been deemed abusive and/or illegal.

b.      Improperly using companies that the Plaintiffs did business with for many years

as intermediaries in order to create a relationship of trust and confidence;

c.      Charging and collecting unreasonable, excessive, and unethical fees;

d.      Failing to fully explain the details of the tax strategies concocted by the Enterprise

before inducing the Plaintiffs to enter into such scheme, including: 1) failing to identify the

various parties, or the roles of the parties, involved in the scheme, including but not limited to

Deutsche Bank and Gresham Financial Partners; 2) failing to reveal to the Plaintiffs the number

of other participants in the scheme, which, upon information and belief, numbers in the hundreds

if not thousands; and 3) failing to reveal the collective number (upon information and belief, in

the hundreds or perhaps thousands) of the strategies and/or transactions that the Enterprise

designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed

any possibility that the tax authorities would find in favor of the Plaintiffs;

e.      Failing to disclose to the Plaintiffs, that if they filed tax returns claiming capital

and/or ordinary losses based on the tax strategies concocted by the Enterprise, they would be

liable to taxing authorities including the IRS for penalties and interest;

f.      Directing and assisting the Plaintiffs in making cash contributions to various

entities formed for the purpose of carrying out the tax strategies concocted by the Enterprise;

h.      Failing to advise, recommend, and instruct the Plaintiffs to amend their tax

returns, timely or otherwise;

i.      Failing to ensure that the transactions into which the Enterprise advised each of

the Plaintiffs to enter complied with applicable State and Federal Rules and Regulations;

98.     The Enterprise has engaged in a "pattern of racketeering activity," as defined in

§1961 of RICO, by committing and/or conspiring to commit or aiding and abetting a transaction

with at least two such acts of racketeering activity, as described herein, with the past ten years.
In fact, upon information and belief, each of the members of the Enterprise and its co-
conspirators have committed at a minimum several hundred acts of racketeering activity. Each
act of racketeering activity was related, had similar purposes, involved the same or similar
participants and methods of commission, and had similar results impacting similar victims,
including the Plaintiffs herein.

99.     The Enterprise's innumerable racketeering activities or predicate acts are related
and also amount to a continuous criminal activity.

100.     These predicate acts are related in the sense that they have the same purpose (to
carry out the scheme described herein); result (to obtain money); victims (such as the Plaintiffs
herein and upon information and belief, several hundred, if not thousands, of others); method of
commission (the scheme described herein); and are otherwise interrelated by distinguishing
characteristics and are not isolated events, because they were carried out for the same purpose.

101.     The predicate acts were committed in the same manner, and they constituted the
Enterprise's "normal" way of doing business with regard to pursuing and soliciting clients, and
inducing and procuring their participation in the tax scheme. Defendants are also engaged in
banking activities separate and apart from the scheme described herein, and their unlawful
actions which constitute the predicate acts giving rise to this RICO claim (set forth herein) are
within their "normal" and "regular" way of doing business.

102.     The multiple acts and the continuity and relatedness of racketeering activity
committed and/or conspired to or aided and abetted by Defendants, as described herein, were
related to each other, amount to and pose a threat of continued racketeering activity, and,
therefore, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C.
§1961(5).

## IV.

### SECOND CAUSE OF ACTION

### DECLARATORY JUDGMENT AND UNJUST ENRICHMENT

103.     An actual, justiciable controversy exists between the Plaintiffs on the one hand
and the Defendants and other Members of the Enterprise on the other.

104.    Had the Plaintiffs not been pursued, solicited and enticed to enter into the tax strategies designed, created, engineered, implemented, marketed, promoted, and/or sold by the Enterprise, they would not have paid fees to the Defendants. The Plaintiffs seeks a declaration that, due to the foregoing lack of consideration, the Defendants have been unjustly enriched and all fees paid to the Defendants should be returned to the Plaintiffs.

105.    Finally, the Plaintiffs seek an award of costs and reasonable and necessary attorneys' fees as are equitable and just.

## V.

## THIRD CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

106.    The Enterprise was the Plaintiffs' fiduciary, and thus owed to the Plaintiffs the duties of honesty, loyalty, care and compliance.

107.    The Enterprise breached its fiduciary duties to the Plaintiffs by advising the Plaintiffs to engage in the tax strategies designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise in reliance on its advice, representations, recommendations, instructions, and opinions, which the Enterprise knew or should have known to be improper and illegal, based on Members of the Enterprise's prior experience with similar strategies which had been deemed abusive by the IRS, for the purposes of generating huge fees for the Enterprise.

108.    The Enterprise breached its fiduciary duties to the Plaintiffs by, among others, the following acts and/or omissions:

a.    misrepresenting the proposed transaction as unique and/or distinct from those previously declared abusive and/or illegal by the IRS;

b.    misrepresenting the likelihood that the taxpayers would prevail should a dispute arise with taxing authorities;

c.    Improperly using companies that the Plaintiffs did business with for many years as intermediaries in order to create a relationship of trust and confidence;

d.    charging and collecting unreasonable, excessive, and unethical fees;

e.    Failing to fully explain the details of the tax strategies concocted by the Enterprise before inducing the Plaintiffs to enter into such scheme, including: 1) failing to identify the various parties, or the roles of the parties, involved in the scheme, including but not limited to Deutsche Bank and Gresham Financial Partners; 2) failing to reveal to the Plaintiffs the number of other participants in the scheme, which, upon information and belief, numbers in the hundreds if not thousands; and 3) failing to reveal the collective number (upon information and belief, in the hundreds or perhaps thousands) of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of the Plaintiffs;

f.    designing, creating, engineering, implementing, marketing, promoting and/or selling an abusive, improper, and invalid tax shelter that was declared abusive and/or illegal by the IRS;

g.    failing to disclose to the Plaintiffs that if they filed tax returns claiming capital and/or ordinary losses based on the tax strategies concocted by the Enterprise, they would be liable to taxing authorities including the IRS for penalties and interest;

h.    representing to the Plaintiffs that the various entities formed to carry out the tax strategies concocted by the Enterprise had a business purpose as well as economic substance;

i.    directing and/or assisting the Plaintiffs in making cash contributions to various entities formed for the purpose of carrying out the tax strategies concocted by the Enterprise;

j.    failing to advise, recommend, and instruct the Plaintiffs to amend its tax returns, timely or otherwise;

k.    representing to the Plaintiffs that the tax strategies concocted by the Enterprise were valid and proper in spite of IRS Notice 2000-44;

l.    failing to ensure that the transactions in which the Enterprise advised each of the Plaintiffs to enter complied with applicable State and Federal Rules and Regulations;

m.    failing to comply with its ethical obligations to the Plaintiffs;

n.    failing to notify the Plaintiffs that the Enterprise and its co-conspirator Members schemed to pursue, solicit, induce, and then place, upon information and belief, several hundred,

if not more than a thousand, customers into these strategies with full knowledge that they would
not pass IRS muster.

109.   As a result of the Enterprise's conduct set forth herein, the Plaintiffs have suffered
injury in that they, among other things:

    1)   paid to the Defendants exorbitant fees;

    2)   took undue financial risk;

    3)   have incurred tax penalties and interest;

    4)   have incurred lost opportunity costs;

    5)   have and will continue to incur substantial additional costs in hiring new
tax and legal advisors to rectify the situation;

    6)   have incurred reputation damage; and

    7)   have foregone alternative tax opportunities.

110.   As a proximate cause of the foregoing, the Plaintiffs have been injured in an
actual amount to be proven at trial, and should be awarded damages in accordance with the
evidence, plus attorneys' fees and costs.

## VI.

## FOURTH CAUSE OF ACTION

### FRAUD

111.   The Enterprise, through its action and inactions, made false and misleading
statements in violation of the laws of the United States and the State of Louisiana as set forth
herein.

112.   Additionally, the Enterprise, through its actions and inactions, made
misrepresentations to the Plaintiffs herein for the purpose of inducing the Plaintiffs to participate
in its schemes to pay the Enterprise enormous sums of money.

113.   In order to induce the Plaintiffs to pay it exorbitant fees, the Defendants and other
Members of the Enterprise made numerous knowingly false affirmative representations and
intentional omissions of material facts to the Plaintiffs, including but not limited to:

    a.   misrepresenting the proposed transaction as unique and/or distinct from those
previously declared abusive and/or illegal by the IRS;

b.      misrepresenting the likelihood that the taxpayers would prevail should a dispute arise with taxing authorities;

c.      Improperly using companies that the Plaintiffs did business with for many years, as intermediaries, in order to create a relationship of trust and confidence;

d.      charging and collecting unreasonable, excessive, and unethical fees;

e.      Failing to fully explain the details of the tax strategies concocted by the Enterprise before inducing the Plaintiffs to enter into such scheme, including: 1) failing to identify the various parties, or the roles of the parties, involved in the scheme, including but not limited to Deutsche Bank and Gresham Financial Partners; 2) failing to reveal to the Plaintiffs the number of other participants in the scheme, which, upon information and belief, numbers in the hundreds if not thousands; and 3) failing to reveal the collective number (upon information and belief, in the hundreds or perhaps thousands) of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of the Plaintiffs;

f.      designing, creating, engineering, implementing, marketing, promoting and/or selling an abusive, improper, and invalid tax shelter that was declared abusive and/or illegal by the IRS;

g.      failing to disclose to the Plaintiffs that if they filed tax returns claiming capital and/or ordinary losses based on the tax strategies concocted by the Enterprise, they would be liable to taxing authorities including the IRS for penalties and interest;

h.      representing to the Plaintiffs that the various entities formed to carry out the tax strategies concocted by the Enterprise had a business purpose as well as economic substance;

i.      directing and/or assisting the Plaintiffs in making cash contributions to various entities formed for the purpose of carrying out the tax strategies concocted by the Enterprise;

j.      failing to advise, recommend, and instruct the Plaintiffs to amend its tax returns, timely or otherwise;

k.      representing to the Plaintiffs that the tax strategies concocted by the Enterprise were valid and proper in spite of IRS Notice 2000-44;

l.      failing to ensure that the transactions in which the Enterprise advised each of the Plaintiffs to enter complied with applicable State and Federal Rules and Regulations;

m.      failing to comply with its ethical obligations to the Plaintiffs;

n.      failing to notify the Plaintiffs that the Enterprise and its co-conspirator Members schemed to pursue, solicit, induce, and then place, upon information and belief, several hundred, if not more than a thousand, customers into these strategies with full knowledge that they would not pass IRS muster.

114.    The above intentional omissions of material fact and/or affirmative representations made by each Defendant and other Members of the Enterprise were false or were likely to be false when made and the Enterprise knew or should have known these representations to be false when made with the intention that the Plaintiffs would rely on them in deciding whether or not to take the advice of the Defendants and other Members of the Enterprise and thereby pay it exorbitant fees and commissions.  In addition, the above affirmative misrepresentations and/or intentional omissions of material facts were made knowingly by the Defendants and other Members of the Enterprise with the intent to induce the Plaintiffs to enter into the abusive tax strategies and pay it exorbitant fees.

115.    In reasonable reliance on the Enterprise's false affirmative representations and intentional omissions of material facts regarding the transactions at issue, the Plaintiffs paid to the Defendants and other Members of the Enterprise exorbitant fees to execute the transaction, did not avail themselves of alternative tax opportunities, filed federal and state tax returns that have been deemed to reflect improper deductions for capital and ordinary losses resulting from the transactions, and did not amend their tax returns.

116.    But for the Enterprise's intentional misrepresentations and material omissions described herein, the Plaintiffs would never have engaged the Enterprise's tax strategies, engaged in the transactions at issue, claimed the purportedly resulting capital and/or ordinary losses on its income tax returns, filed and signed their tax returns in reliance on the advice of the Enterprise, failed to amend their tax returns, and/or failed to avail themselves of other alternative tax opportunities.

117.   Due to the Enterprise's fraud, the Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.  As a result of the Enterprise's conduct set forth herein, the Plaintiffs have suffered injury in that they, among other things:

        1)     paid to the Defendants exorbitant fees;

        2)     took undue financial risk;

        3)     have incurred tax penalties and interest;

        4)     have incurred lost opportunity costs;

        5)     have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation;

        6)     have incurred reputation damage; and

        7)     have foregone alternative tax opportunities.

118.   As a proximate cause of the foregoing, the Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## VII.

## FIFTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

119.   The Enterprise owed the Plaintiffs duties of care, loyalty, and honesty, and a duty to comply with the applicable standards of care.

120.   During the course of its dealings with the Plaintiffs, the Enterprise made numerous knowingly or negligent false representations, and intentional or negligently misleading omissions of fact, and gave numerous recommendations, advice, instructions, and opinions to the Plaintiffs, including but not limited to:

      a.     misrepresenting the proposed transaction as unique and/or distinct from those previously declared abusive and/or illegal by the IRS;

      b.     misrepresenting the likelihood that the taxpayers would prevail should a dispute arise with taxing authorities;

c.    Improperly using companies that the Plaintiffs did business with for many years, as intermediaries, in order to create a relationship of trust and confidence;

d.    charging and collecting unreasonable, excessive, and unethical fees;

e.    Failing to fully explain the details of the tax strategies concocted by the Enterprise before inducing the Plaintiffs to enter into such scheme, including: 1) failing to identify the various parties, or the roles of the parties, involved in the scheme, including but not limited to Deutsche Bank and Gresham Financial Partners; 2) failing to reveal to the Plaintiffs the number of other participants in the scheme, which, upon information and belief, numbers in the hundreds if not thousands; and 3) failing to reveal the collective number (upon information and belief, in the hundreds or perhaps thousands) of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of the Plaintiffs;

f.    designing, creating, engineering, implementing, marketing, promoting and/or selling an abusive, improper, and invalid tax shelter that was declared abusive and/or illegal by the IRS;

g.    failing to disclose to the Plaintiffs that if they filed tax returns claiming capital and/or ordinary losses based on the tax strategies concocted by the Enterprise, they would be liable to taxing authorities including the IRS for penalties and interest;

h.    representing to the Plaintiffs that the various entities formed to carry out the tax strategies concocted by the Enterprise had a business purpose as well as economic substance;

i.    directing and/or assisting the Plaintiffs in making cash contributions to various entities formed for the purpose of carrying out the tax strategies concocted by the Enterprise;

j.    failing to advise, recommend, and instruct the Plaintiffs to amend its tax returns, timely or otherwise;

k.    representing to the Plaintiffs that the tax strategies concocted by the Enterprise were valid and proper in spite of IRS Notice 2000-44;

l.    failing to ensure that the transactions in which the Enterprise advised each of the Plaintiffs to enter complied with applicable State and Federal Rules and Regulations;

m.    failing to comply with its ethical obligations to the Plaintiffs;

n.      failing to notify the Plaintiffs that the Enterprise and its co-conspirator Members schemed to pursue, solicit, induce, and then place, upon information and belief, several hundred, if not more than a thousand, customers into these strategies with full knowledge that they would not pass IRS muster.

121.    The Enterprise either knew or reasonably should have known its representations, instructions, and opinions to be false.  In addition, the rendering of such representations, instructions and opinions, as well as the failure to advise the Plaintiffs of the omissions as set forth herein, was negligent, grossly, negligent, and reckless.

122.    The Plaintiffs fully performed their obligations as directed by the Enterprise and thus did not contribute to the intentional, negligent, grossly negligent, and/or reckless acts in any way.

123.    In reasonable reliance on the Enterprise's false affirmative representations and intentional omissions of material facts regarding the transactions at issue, the Plaintiffs paid exorbitant fees to execute the transaction, did not avail itself of alternative tax opportunities, filed federal and state tax returns that have been and/or likely will be deemed to reflect improper deductions for capital and ordinary losses resulting from the transactions, and did not amend their tax returns.

124.    But for the Enterprise's failure to meet the applicable standard of care and the intentional and/or negligent misrepresentations and material omissions described herein, the Plaintiffs would never have engaged in the Enterprise's tax strategies, filed the Federal and State tax returns that reflected deductions for capital and/or ordinary losses resulting from the tax strategies, failed to amend their tax returns, and/or failed to avail themselves of other alternative tax opportunities.

125.    After discovering the Enterprise's professional malpractice and misrepresentations, the Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

126.    As a result of the Enterprise's conduct set forth herein, the Plaintiffs have suffered injury in that they, among other things:

1)      paid to the Defendants exorbitant fees;

      2)     took undue financial risk;

      3)     have incurred tax penalties and interest;

      4)     have incurred lost opportunity costs;

      5)     have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation;

      6)     have incurred reputation damage; and

      7)     have foregone alternative tax opportunities.

     127.    As a proximate cause of the foregoing, the Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## VIII.

## SIXTH CAUSE OF ACTION

## BREACH OF CONTRACT

     128.    The Plaintiffs entered into contracts with Deutsche Bank and Gresham Financial Partners, which included a December 7, 2001 "Memorandum of Sale to Gresham Financial Partners" of interests in an Illinois Trust which was created on November 2, 2001. The agreement involved the Plaintiff as Seller[9], Gresham Financial Partners as Buyer, and Deutsche Bank as creditor, the details of this transaction more fully described in the previous paragraph 53 of this Petition under the subsection titled "Features of the Strategy." In connection therewith, the Enterprise was expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with all applicable rules of professional conduct and to make all of the appropriate disclosures, including but not limited to:

      1)     identifying the roles of the various parties involved in the scheme, which upon information and belief, included Gresham Financial Partners;

      2)     revealing to the Plaintiffs the number of other participants in the scheme, which upon information and belief, included Gresham Financial Partners; and

---

[9] Each Plaintiff entered into identical Memorandums of Sale to Gresham Financial Partners more fully explained in this Petition under the subsection titled "Features of the Strategy."

    3)      failing to reveal the collective number of strategies and/or transactions that Deutsche Bank, and its intermediaries, which upon information and belief, included Gresham Financial Partners, designed, created, engineered, implemented, marketed, promoted and/or sold, which foreclosed any possibility that the tax authorities would find in favor of the Plaintiffs.

    129.    Deutsche Bank and Gresham Financial Partners, as members of the Enterprise, ignored its obligations and instead provided the Plaintiffs with opinions, recommendations, representations and instructions that the Defendants either knew or reasonably should have known to be wrong.  In addition, the rendering of such representations, recommendations, representations, instructions and opinions, as well as the failure to advise the Plaintiffs of the omissions set forth herein, was negligent, grossly negligent, and reckless.  Accordingly, the Defendants failed to exercise the standard of care required of them and breached its contracts with the Plaintiffs.

    130.    As a result of the Defendants' conduct set forth herein, the Plaintiffs have suffered injury in that they, among other things:

        1)      paid to the Defendants exorbitant fees;

        2)      took undue financial risk;

        3)      have incurred tax penalties and interest;

        4)      have incurred lost opportunity costs;

        5)      have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation;

        6)      have incurred reputation damage; and

        7)      have foregone alternative tax opportunities.

    131.    As a proximate cause of the foregoing, the Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## IX.

## SEVENTH CAUSE OF ACTION

## CIVIL CONSPIRACY

132.    As described more fully herein, Deutsche Bank and Gresham Financial Partners, as members of the Enterprise knowingly acted in concert to market and implement the fraudulent and abusive tax shelter transactions.  In doing so, the Defendants acted with full knowledge and awareness that the transaction was designed to give the false impression that a complex series of financial transaction were legitimate business transactions which had economic substance from an investment standpoint, when they in fact lacked those features (which were necessary for successful tax strategies).

133.    The Defendants and its co-conspirators in the Enterprise acted as described herein according to a predetermined and commonly understood and accepted plan of action, all for the purposes of obtaining professional fees from consumers, including the Plaintiffs.

134.    The acts of the Defendants and its co-conspirators in the Enterprise were contrary to numerous provisions of law, as stated herein.

135.    There was a meeting of the minds between and among the Defendants and its co-conspirators of the Enterprise along with other individuals and entities, both known and unknown, to commit the unlawful acts alleged herein.  This conspiracy to commit these unlawful, overt acts proximately caused and continued to cause the Plaintiffs damages as set forth herein.

136.    As a result of the conduct of the Defendants and its co-conspirators of the Enterprise, the Plaintiffs have suffered injury to its business and property in that the Plaintiffs have paid to the Defendants exorbitant fees and have incurred actual damages and losses in an amount to be proven at trial; the Plaintiffs have incurred tax penalties and interest and disallowance of other certain deductions; have incurred and will continue to incur substantial additional fees and costs in hiring new tax and legal advisors to rectify the situation; and have foregone alternative tax and investment opportunities.

137.   As proximate cause of the foregoing, the Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## X.

## DAMAGES

138.   As a proximate cause of the Enterprise's violation of 18 U.S.C. §1962(a) - (d), the Plaintiffs have been injured in their business or property for the reasons described herein and because they were forced to expend a substantial amount of money in fees to the Enterprise for false and fraudulent services, and have paid and continue to incur substantial additional costs and expenses for engaging attorneys, tax attorneys, accountants and experts in an attempt to rectify the wrongs perpetrated against them.

139.   The Enterprise has exposed the Plaintiffs to substantial additional tax liability, including interest and penalties, due to the Plaintiffs' filing of tax returns based on the Enterprise's illegal and/or abusive tax advice and its failure to advise the Plaintiffs to amend those returns.

140.   The Enterprise and its co-conspirators have caused the Plaintiffs to incur severe financial and business losses.

141.   As set forth herein, as a result of the conduct of the Enterprise and its co-conspirators, the Plaintiffs have suffered injury to its business and property in that the Plaintiffs have paid to the Defendants and other Members of the Enterprise exorbitant fees and have incurred actual damages and losses in amount to be proven at trial; the Plaintiffs have incurred tax penalties and interest and disallowance of other certain deductions; have incurred and will continue to incur substantial additional fees and costs in hiring new tax and legal advisors to rectify the situation; and have foregone alternative tax and investment opportunities.

142.   Pursuant to 18 U.S.C. §1964(c), the Plaintiffs are entitled to threefold the amount of actual damages suffered them due to the actions of the Enterprise.

143.   Plaintiffs are also entitled to be awarded the costs incurred in this suit, pre-judgment interest, reasonable attorneys' fees and all other damages authorized by law.

**WHEREFORE**, Plaintiffs, Allen R. Boudreaux, Gene R. Clouatre, and James B. Rutland, pray that this Petition be filed and served on all parties and that there be judgment as follows:

1.      As to the RICO claim, a judgment in favor of the Plaintiffs and against each Defendant jointly and severally an *in solido*, for actual damages in an amount to be proven at trial, plus treble damages, attorneys' fees, interest and costs;

2.      As to the Declaratory Judgment and Unjust Enrichment claim, an order on behalf of the Plaintiffs entering the declaratory relief prayed for herein, together with the return to the Plaintiffs all amounts by which the Defendants have been unjustly enriched;

3.      As to the Breach of Fiduciary Duty claim, a judgment in favor of the Plaintiffs against each Defendant jointly and severally and *in solido*, for actual damages in an amount to be proven at trial, plus attorneys' fees, interest and costs;

4.      As to the Fraud claim, a judgment in favor of the Plaintiffs against each Defendant joint and severally and *in solido*, for actual damage in an amount to be proven at trial, plus attorneys' fees and costs, and return of all monies paid by the Plaintiffs herein;

5.      As to the Negligent Misrepresentation claim, a judgment in favor of the Plaintiffs against each Defendant jointly and severally and *in solido*, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs;

6.      As to the Breach of Contract claim, a judgment in favor of the Plaintiffs against each Defendant jointly and severally and *in solido*, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs;

7.      As to the Civil Conspiracy claim, a judgment in favor of the Plaintiffs against each Defendant jointly and severally and *in solido*, for actual damages in an amount to be proven at trial, plus attorneys' fees and costs;

8.      Against each Defendant, actual damages, including the Plaintiffs' tax liability, interest and penalties; attorneys' fees; costs; interest; and such other and further relief as the Court may deem just and proper; and

9.      That the Court grant such other, further, and different relief as the Court deems just and proper under the Circumstances.

Respectfully submitted:

By: _____
Rodi F. Rispone #23554
15961 Airline Highway
Baton Rouge, LA 70817
Phone: 225.756.5090
Fax:    225.753.7012
*Attorney for the Plaintiffs*

**Please Serve:**

**Gresham Financial Partners**
Through its agent
Kenneth A. Brown
4209 Vincennes Place
New Orleans, LA 70125

**Please serve the following via Long Arm Statute, 13:3201,et seq.**

**Deutsche Bank AG**
Through its agent for service of process
CT Corporation System
111 Eighth Avenue
New York, NY 10011

**Deutsche Bank Alex Brown**
Through its agent for service of process
CT Corporation System
111 Eight Avenue
New York, NY 10111

**Waterford Capital Investors, Inc.**
*Through its agent of service of process*
National Registered Agents, Inc.
160 Greentree Drive, Ste. 101
Dover, DE 19904

**Gravier Financial Ltd.**
Through its agent of service of process
National Registered Agents, Inc.
160 Greentree Drive, Suite. 101
Dover, DE 19904

A TRUE COPY

DEPUTY CLERK, U.S. DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA.

INSTRUMENTATION & ELECTRICAL CONTRACTORS



June 28, 2007

JUN 28 2007

CIVIL DISTRICT COURT

Ms. Cynthia Stromboe
Civil District Court Clerk
421 Loyola Ave., Room 402
New Orleans, LA 70112

RE:    New Suit Filing – Allen R. Boudreaux, et al v. Deutsche Bank AG
       Civil District Court for the Parish of Orleans

Dear Cynthia:

    Thanks for walking me through the Long Arm Statute Service procedures by phone
today. As requested, here are 5 additional copies of the 38 p. Petition for Damages.

    I look forward to receiving the citations you are preparing for us. Your assistance is
appreciated.

Sincerely,

Sharon M. Odom
Legal Assistant to Rodi F. Rispone

Enclosures:
    (5) Copies Petition for Damages

P.O. Box 84210  •  Baton Rouge, LA 70884-4210  •  (225) 756-5090  •  FAX (225) 753-7012

INSTRUMENTATION & ELECTRICAL CONTRACTORS

RECEIVED

JUN 26 2007

CIVIL DISTRICT COURT

June 25, 2007

The Hon. Dale N. Atkins
ATTN: Belinda T. Lassalle
Civil District Court Clerk
421 Loyola Ave., Room 402
New Orleans, LA 70112

> RE:   New Suit Filing – Allen R. Boudreaux, et al v. Deutsche Bank AG
>        Civil District Court for the Parish of Orleans

Dear Ms. Lassalle:

We are in receipt of your June 8, 2007, correspondence and have corrected the filing as directed. Enclosed is the original and one copy of a Petition for Damages as captioned above. Please file the original and use the additional copy for service upon the Orleans Parish defendant, Gresham Financial Partners.

As you can see, we require the proper court documentation to serve four other defendants by Long Arm Statute. Please forward that documentation and file-stamp a copy of the Petition for Damages (first page only) and return for our file in the enclosed return materials.

We enclose, as well, a check in the amount of $308, the cost of filing this 48-page petition and a check payable to the Sheriff's office in the amount of $20 for the service fee.

Please contact me at 1/800-880-5090 if you require anything further or have questions. Otherwise, I look forward to receiving the Long Arm Statute service documentation and the file-stamped copy of the first page of the Petition.

Sincerely,

Sharon M. Odom
Legal Assistant to Rodi F. Rispone

Enclosures:
    Petition for Damages
    Checks 01108988 -- $308;
           01108989 -- $20
    Return materials

P.O. Box 84210 • Baton Rouge, LA 70884-4210 • (225) 756-5090 • FAX (225) 753-7012

CIVIL DISTRICT COURT FILED

PARISH OF ORLEANS
2007 JUL 25  P 2:56
STATE OF LOUISIANA

CIVIL
DISTRICT COURT

ALLEN R. BOUDREAUX, GENE R.                    DOCKET NO. 2007-6122
CLOUATRE and JAMES B. RUTLAND,
        Plaintiffs

                                               DIVISION H12
VERSUS

DEUTSCHE BANK AG, DEUTSCHE BANK
SECURITIES, INC. d/b/a DEUTSCHE BANK
ALEX. BROWN, a division of DEUTSCHE BANK
SECURITIES, INC., GRESHAM FINANCIAL
PARTNERS, WATERFORD CAPITAL INVESTORS,
AND GRAVIER FINANCIAL, LTD.,
        Defendants

## DEUTSCHE BANK'S DECLINATORY AND DILATORY EXCEPTIONS TO PLAINTIFFS' PETITION

Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. d/b/a Deutsche

Bank Alex. Brown (collectively, "Deutsche Bank"), except to Plaintiffs' Petition for Damages

("Petition") as follows:

### DECLINATORY EXCEPTION OF LACK OF JURISDICTION OVER THE SUBJECT MATTER OF THE ACTION

Deutsche Bank pleads the declinatory exception of lack of jurisdiction over the

subject matter of this action, pursuant to Louisiana Code of Civil Procedure art. 925, and La.

R.S. 9:4201, *et seq.*  Deutsche Bank shows that Plaintiffs have entered into a contract or are

bound by a contract that requires the arbitration of Plaintiffs' claims in this action.

Accordingly, to the extent that the arbitration of Plaintiffs' claims against

Deutsche Bank has not yet occurred, *the Court lacks subject matter jurisdiction over this*

proceeding.

### DILATORY EXCEPTION OF PREMATURITY

Plaintiffs' Petition is premature pursuant to La. Code of Civ. Pro. Art. 926, in that

Plaintiffs have entered into or are bound by a contract that requires them to submit their dispute

with Deutsche Bank to binding arbitration. Such contracts require the arbitration of all claims

and controversies subject to such contract. Such required arbitrations have not taken place in this

case. Therefore, Plaintiffs' Petition is premature.

-1-

WHEREFORE, Deutsche Bank prays that this Court sustain its exceptions, and render judgment dismissing Plaintiffs' claims.

Respectfully submitted,

Julie P. Silbert (#14439)
KEAN MILLER HAWTHORNE D'ARMOND
MCCOWAN & JARMAN, L.L.P.
909 Poydras Street, Ste. 1450
New Orleans, Louisiana 70112
Telephone: (504) 585-3050

Todd A. Rossi (#11478)
KEAN, MILLER, HAWTHORNE, D'ARMOND,
MCCOWAN & JARMAN, L.L.P.
One American Place, 22nd Floor
Post Office Box 3513 (70821)
Baton Rouge, Louisiana 70825
Telephone: (225) 387-0999

*Attorneys for Deutsche Bank AG and
Deutsche Bank Securities Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Deutsche Bank's Declinatory and Dilatory Exceptions to Plaintiffs' Petition has this day been placed in the U.S. Mail, certified mail, return receipt requested, and addressed to all counsel of record as follows:

Rodi F. Rispone
15961 Airline Highway
Baton Rouge, LA 70817

New Orleans, Louisiana, this 25th day of July, 2007.

Julie P. Silbert

CIVIL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

ALLEN R. BOUDREAUX, GENE R.                    DOCKET NO. 2007-6122
CLOUATRE and JAMES B. RUTLAND,
       Plaintiffs
                                               DIVISION H12
VERSUS

DEUTSCHE BANK AG, DEUTSCHE BANK
SECURITIES, INC. d/b/a DEUTSCHE BANK
ALEX. BROWN, a division of DEUTSCHE BANK
SECURITIES, INC., GRESHAM FINANCIAL
PARTNERS, WATERFORD CAPITAL INVESTORS,
AND GRAVIER FINANCIAL, LTD.,
       Defendants

## DEUTSCHE BANK'S MEMORANDUM IN SUPPORT OF DECLINATORY AND DILATORY EXCEPTIONS TO PLAINTIFFS' PETITION

Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. d/b/a Deutsche

Bank Alex. Brown (collectively, "Deutsche Bank"), submit this memorandum in support of its

declinatory and dilatory exceptions to Plaintiffs' Petition for Damages ("Petition"). The Court

lacks subject matter jurisdiction and the Petition is premature, as the Plaintiffs are contractually

bound to submit this dispute to arbitration. For this reason, Deutsche Bank requests that the

Court sustain its exceptions, and render a judgment dismissing Plaintiffs' claims.[1]

I.    **ARGUMENT**

      A.    **Standard of Review**

            Section 925 of the Louisiana Code of Civil Procedure provides that the objection

which may be raised by the declinatory exception include the Court's lack of jurisdiction over

the subject matter of the action and improper venue. Likewise, Article 926 of the Louisiana

Code of Civil Procedure provides that the objections which may be raised by the dilatory

exception include prematurity.

            1.    **The Court Lacks Subject Matter Jurisdiction Over This Proceeding.**

            Plaintiffs have entered into a contract that requires them to submit their dispute

with Deutsche Bank to a binding arbitration.

            In this case, each Plaintiff executed an "Account Agreement" that were all

executed in November 2001. Those agreements were executed by Deutsche Bank Alex. Brown

---

[1] Deutsche Bank will also file a Notice of Removal to remove this case to the Federal District Court for the Eastern District of Louisiana. By filing these exceptions, Deutsche Bank does not waive or compromise the controlling nature of federal law, or its right to remove this case.

Inc., the successor to Deutsche Bank Securities Inc. ("DBSI"), Deutsche Bank's subsidiary and

agent, and the individual Plaintiffs and contains a provision that requires Plaintiffs to submit

their claims to arbitration.[2]  Specifically, the Account Agreement states that plaintiffs agree:

> "I agree to arbitrate with you **any controversies which may arise,**
> whether or not based on events occurring prior to the date of this
> agreement, including any controversy arising out of or relating to
> any account with you, to the construction, performance or breach
> of any agreement with you, or to transactions with you or for
> you[.]" (emphasis added) .

Accordingly, by agreement, Plaintiffs consented to arbitration as the appropriate means to

resolve their disputes.  Deutsche Bank is entitled to enforce this agreement on grounds o

agency, as an intended third-party beneficiary, as DBSI's parent, and on grounds of equitable

estoppel.[3]

Federal and state law strongly uphold a party's right to demand arbitration.  *See*

*e.g., Matthews v. McCracken Rutland Corp. v. City of Plaquemine,* 414 So.2d 756 (La. 1982)

*Flatland Real Estate Co., LLC v. Dugas Const. Inc.,* 2000-1794 (La. App. 3rd Cir. 5/9/01), 78

So.2d 867.  Pursuant to La. R.S. 9:4201, a provision in any written contract to settle b

arbitration a claim or controversy shall be valid, irrevocable, and enforceable, except upo

grounds as exist at law or in equity to revoke a contract.[4]  The Federal Arbitration Act require

arbitration of contracts such as this one which "evidenc[es] a transaction involving commerce.

9 U.S.C. § 2.  Specifically, La. R.S. 9:4201 provides:

> A provision in any written contract to settle by arbitration or
> controversy thereafter arising out of a contract . . . or an agreement
> in writing between two or more persons to submit to arbitration
> any controversy existing between them at the time of the
> agreement to submit, shall be valid, irrevocable, and enforceable,
> save upon grounds as exist at law or in equity for the revocation of
> any contract.

In this case, the Court lacks subject matter jurisdiction over the claims at issue

because the Customer Agreement requires the arbitration of all claims and controversies arisin

under such contract.  Deutsche Bank represents that the arbitration of Plaintiffs' claims again

---

[2] A copy of the agreement is attached as Exhibit "A."

[3] This exception, as well as the following exception of prematurity, is filed as a precaution to preclude a
claims of waiver under state law related to the timing of Deutsche Bank's assertion of these exception
Deutsche Bank maintains that federal law controls and that arbitration is further required under fede
law.  Accordingly, raising these exceptions is made with a full reservation of Deutsche Bank's right
compel arbitration under applicable federal and state law.

[4] Moreover, pursuant to La. R.S. 9:4202, the district court, shall, upon the application of one or mo
parties, stay the trial of any action or proceeding brought upon any issue referable to arbitration under
agreement until such arbitration has taken place.

Deutsche Bank has not yet taken place. Therefore, the Court lacks subject matter jurisdiction over this proceeding, pursuant to La. R.S. 9:4201, *et seq.*, until such arbitration has taken place.

### 2.    **Dilatory Exception of Prematurity**

As set forth herein, Louisiana law establishes that when a contract contains an arbitration provision, such provision shall be valid, irrevocable, and enforceable. The Federal Arbitration Act is to the same effect. In this case, plaintiffs' claims against Deutsche Bank are premature in that arbitration, as required by the contracts at issue, has not yet taken place. The proper procedural device to assert Deutsche Bank's right to arbitration is the dilatory exception of prematurity. Specifically, the dilatory exception of prematurity is a threshold device designed to terminate an action brought before the right to enforce it has accrued. *See, e.g, May v. Southland Corp.*, 341 So.2d 421 (La. App. 3rd Cir. 1976). The arbitration of Plaintiffs' claims under a contract that requires arbitration has not yet taken place. Pursuant to Louisiana law, Deutsche Bank has a right to enforce arbitration. Accordingly, the Court should terminate Plaintiffs' action to allow for arbitration.

### II.    **CONCLUSION**

For the foregoing reasons, Deutsche Bank prays that the Court grant its declinatory and dilatory exceptions, at Plaintiffs' costs.

Respectfully submitted,

Julie P. Silbert (#14439)
KEAN MILLER HAWTHORNE D'ARMOND
MCCOWAN & JARMAN, L.L.P.
909 Poydras Street, Ste. 1450
New Orleans, Louisiana 70112
Telephone: (504) 585-3050

Todd A. Rossi (#11478)
KEAN, MILLER, HAWTHORNE, D'ARMOND,
MCCOWAN & JARMAN, L.L.P.
One American Place, 22nd Floor
Post Office Box 3513 (70821)
Baton Rouge, Louisiana 70825
Telephone: (225) 387-0999

*Attorneys for Deutsche Bank AG and
Deutsche Bank Securities Inc.*

**CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of Deutsche Bank's Memorandum in Support of Declinatory and Dilatory Exceptions to Plaintiffs' Petition has this day been placed in the U.S. Mail, certified mail, return receipt requested, and addressed to all counsel of record as follows:

        Rodi F. Rispone
        15961 Airline Highway
        Baton Rouge, LA 70817

New Orleans, Louisiana, this _____ day of July, 2007.

_____
        Julie P. Silbert

# EXHIBIT A

Deutsche Banc Alex. Brown Inc.

**Deutsche Bank**

## Account Agreement

ALLEN BOUDREAUX
Name(s)

Deutsche Banc Alex. Brown Inc.

P.O. Box 515
Baltimore, MD 21203

Address

BATON ROUGE          LA
City                      State          Zip Code          Account Number     64 15

**IMPORTANT. PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE**

In consideration of Deutsche Banc Alex. Brown Inc. (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned (defined below), and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) (defined below) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s)" of the Undersigned" and "My Account(s)" shall mean the account in the name of the undersigned. "You" and "your" refer to Deutsche Banc Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees. Deutsche Banc Alex. Brown is a subsidiary of Deutsche Banc AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Banc AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a (i) jointly incorporated legal entity, none of which is responsible for the obligations of the others provided, however, that Deutsche Bank and its subsidiaries and affiliate shall have the rights of set off specifically provided in Paragraph 12. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1.  **Representations**

Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, investment company, investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying my obligations undertaken through My Account(s) and that no one except the person named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2.  **Applicable Rules and Regulations**

All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and Usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3.  **Confirmations, Statements and Written Communications**

I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on you. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger, electronically or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4.  **Aggregation of Orders and Average Prices**

I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5.  **Cash Accounts**

This paragraph relates to and is effective solely with respect to cash accounts: (i) the undersigned will make full cash payment on or before settlement date for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for or provided in the preceding clause; (iii) the undersigned will owe each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security therein on or before settlement date; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requirements for additional deposits or, with respect to any uncleared security purchased or sold, to mark to the market.

6.  **Short and Long Orders; Delivery and Settlement**

I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by me as "long." "Short sale" means any sale of a security for which the undersigned does not own or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sale by selling in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security to be sold and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you

CHICAGO 178720v4 99999-00604

fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s) with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of any time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

**7.  Authority to Borrow**

In case of the sale of any security or other property by you at any direction and your inability to timely deliver the same to the purchaser by reason of any failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8.  Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9.  Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank AG (including, without limitation, Deutsche Bank AG) to share among such affiliates each information list and any other confidential information you and each affiliate(s) may have about me and My Account(s).

**10.  Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11.  Lien**

I hereby grant to you and to affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you arising under this Account Agreement, or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you to which I have an interest, and you may at your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy any such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12.  Setoff**

I agree that the balance of My Account(s) shall be subject to a lien and a security interest in favor of you, Deutsche Bank AG and all affiliates of Deutsche Bank AG and subject to set off against the Obligations (as defined below) to you, Deutsche Bank AG or any affiliate of Deutsche Bank AG; you, Deutsche Bank AG or any affiliate of Deutsche Bank AG, may at any time or from time to time at your option and without notice, following the occurrence and during the continuation of an Event of Default (or an Event of Default as such terms are defined in the documents creating the Obligations), appropriate and apply toward the payment of such Obligations that balance of my Account(s), provided, however, that you, Deutsche Bank AG or any affiliate of Deutsche Bank AG, may exercise the foregoing right of set off regardless of the existence of a Default or Event of Default with respect to any payment obligation by you, Deutsche Bank AG or any affiliate of Deutsche Bank AG. In no event shall any Obligation due to you from me against my Obligation due to you, Deutsche Bank AG or any affiliate of Deutsche Bank AG, from me, whether or not such Obligation is then due and payable. For the purpose of the setoff described in this paragraph 12, the term "Obligations" shall be limited to such obligations as I may from time to time an identity in writing to you, Deutsche Bank AG and/or any affiliate of Deutsche Bank AG as an "Obligation" for purposes of this paragraph 12; provided, however, that any such setting setting forth the term Obligations must be mutually agreed to by me and you.

**13.  Margin Maintenance, Costs for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral in the limitation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any amount with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether owned individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Upon a default, I will also bear the cost of preserving the value of collateral, including hedging transactions that may be executed at your discretion. Any sales or purchases hereunder may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**14.  Third Party Authorization; No Agency**

If I have authorized any registered investment advisor or other third party to give you instructions with respect to My Account(s) with you, you are authorized to accept from such third party, without inquiry or investigation by you, (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand that any investment advisor or other third party I authorize to act for you, whether or not retained to me by you, is not your agent and that you shall have no responsibility or liability to me for any sale or omission of such third party, its officers, employees or agents.

**15.  Correspondent Account No Agency**

If My Account(s) has been introduced to you by an agreement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any sale or omission of such other broker-dealer, its officers, employees or agents.

**16.  Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us of, or any of the account amount. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that on account will be settled on your books in the form directed by the above account owner. In the event of the death of any of us, the

service(s) shall immediately give your written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's heirs or representatives of any rights in the account shall be chargeable against the interest of the service(s) as well as against the interest of the estate of the decedent.

**17.  Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are considered subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity hereof or to ascertain the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unissued; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Banc AG, in dealing with such affiliate, such affiliate may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**18.  Acknowledgement of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Banc AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different views, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Banc AG are aware of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that Deutsche Banc Alex. Brown and affiliates of Deutsche Banc AG may provide services to or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Banc AG may be paid fees by Registered Investment Companies or other investment vehicles, including, without limitation, fees for acting as investment advisor, subadvisor, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Banc AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**19.  No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are/not deposits or other obligations of Deutsche Banc AG or any other bank, are not guaranteed by Deutsche Banc AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Banc AG is an obligor. These products may be complex, may not preclude for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. That means they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Banc AG states in writing that a particular product is subject to FDIC insurance.

**20.  Arbitration**

I understand that:  (1) Arbitration is final and binding on the parties.  (2) The parties are waiving their right to seek remedies in court, including the right to jury trial.  (3) Pre-arbitration discovery is generally more limited than and different from court proceedings.  (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.  (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry. I agree to arbitrate with you any controversy which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21203, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may select the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (i) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

**21.  Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. I shall have the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between you and me concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement and My Account(s) shall be governed by, and construed in accordance with, the laws of the State of New York. Transactions of any provision in any other agreement, for purposes of the Uniform Commercial Code, New York shall be deemed to be your jurisdiction and My Account(s) (as well as any security settlement with respect to any financial assets credited thereto) shall be governed by the laws of the State of New York.

**22.  Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**23.  Please Complete 22a or 22b as applicable.**



3



**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- If I cannot familiar with the inventories and risks of margin, I should not open a margin account or engage in margin transactions.

- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.

- I will be obligated to pay interest on all sums I borrow from you.

- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.

- By using a margin account to leverage my investments, I increase my risk of loss.

- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.

- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge this securities in my account may be loaned to Deutsche Banc Alex. Brown or principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Agreement.

4

CHICAGO 174720v4 89999-80054

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 35.

Signature _____    Date _____

Signature _____    Date _____

Signature _____    Date _____

Paragraph 23 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

5

Deutsche Banc Alex. Brown Inc.

**Deutsche Bank**

# Account Agreement

GENE CLOUATRE
Name(s)

Deutsche Banc Alex. Brown Inc.

P.O. Box 515
Baltimore, MD 21203

Address

PIERRE PORT, LA
City                State            Zip Code            Account Number

6 5  1 4

**IMPORTANT. PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE**

In consideration of Deutsche Banc Alex. Brown Inc. (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned (defined below), and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) (defined below) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the Undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on the account. "Account(s) of the Undersigned" and "My Account(s)" shall mean this account in the name of the undersigned. "You" and "your" refer to Deutsche Banc Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees. Deutsche Banc Alex. Brown is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others, provided, however, that Deutsche Bank and its subsidiaries and affiliates shall have the rights of and all specifically provided in Paragraph 12, "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

**1.   Representations**

Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or association of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, investment company, investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial elements risk, and I represent to you that I knowingly and willingly assume such risk.

**2.   Applicable Rules and Regulations**

All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

**3.   Confirmations, Statements and Written Communications**

I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me. Confirmation of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications to you, whether by mail, plumb courier, telefacsimile, messenger, electronically or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

**4.   Aggregation of Orders and Average Prices**

I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

**5.   Cash Accounts**

This paragraph relates to and in effective solely with respect to cash account(s): (i) the undersigned will make full cash payment on or before settlement date for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for or provided in the preceding clause; (iii) the undersigned will own such security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security therefor on or before settlement date; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to avoid necessary requests for additional deposits or, with respect to any unissued security purchased or sold, in event to the market.

**6.   Short and Long Orders; Deliveries and Settlements**

I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I acknowledge that you may, at your discretion, immediately cover any short sales made in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restrictions, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees in My Account(s). I agree that if you

CDCADD 174723v4 99999-00004

1

(a) to receive payment for securities I have purchased you may, without prior demand or notice, sell securities or other property held by you in any of My Account(s) with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of any time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

**7.    Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8.    Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from any failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balances which is computed by crediting all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9.    Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank AG (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10.    Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11.    Liens**

I hereby grant to you and each affiliate of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliate in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you, arising under this Account Agreement or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you. In which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12.    Setoff**

I agree that the balance of My Account(s) shall be subject to a lien and a security interest in favor of you, Deutsche Bank AG and all affiliates of Deutsche Bank AG and subject to set off against the Obligations (as defined below) to you, Deutsche Bank AG or any affiliates of Deutsche Bank AG; you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, may at any time or from time to time at your option and without notice, following the occurrence and during the continuation of a Default or an Event of Default (as such terms are defined in the documents creating the Obligations), appropriate and apply toward the payment of such Obligations that balance of my account(s); provided, however, that you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, may exercise the foregoing right of set off regardless of the existence of a Default or Event of Default with respect to any payment obligation to you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, to the extent any Obligation due to you from me against any Obligation due to you, Deutsche Bank AG or any affiliate of Deutsche Bank AG, becomes, whether or not such Obligation is then due and payable. For the purposes of this setoff described in this paragraph 12, the term "Obligations" shall be broad to such obligations as I may from time to time be liable in writing to you, Deutsche Bank AG and/or any affiliate of Deutsche Bank AG as an "Obligation" for purposes of this paragraph 12; provided, however, that any such liability setting forth the term Obligations must be mutually agreed to, by me and you.

**13.    Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such amounts of and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as each may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment of any against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional monies, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Upon a default, I will also bear the cost of preserving the value of collateral, including hedging transactions that may be executed at your discretion. Any sales or purchases hereunder may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**14.    Third Party Authorized on; No Agency**

If I have authorized any registered investment adviser or other third party to give you instructions with respect to My Account(s) with you, you are authorized to accept from such third party, without inquiry or investigation by you, (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**15.    Correspondent Accounts; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**16.    Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to the account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for the account. You may either bar the instructions of any of us concerning the account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the

2

survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or render restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future law or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**17. Foreign Securities**

With respect to deal of equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are more illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically found in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discretionary treatment of foreign investors, etc; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the related foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliate, such affiliate may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**18. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups of Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom at one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including, without limitation, fees for acting as investment adviser, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**19. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) still subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time acquire investment products as to which Deutsche Bank AG is an obligor. These products may be complex, and will provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be promoted as is principal or interest between Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**20. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include limited findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators could typically include a minority of arbitrators who were or are affiliated with the securities industry. I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make any election by registered mail to you, at P.O. Box 616, Baltimore, MD 21203, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

**21. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between you and me concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement and My Account(s) shall be governed by, and construed in accordance with, the laws of the State of New York. Regardless of any provision in any other agreement, for purposes of the Uniform Commercial Code, New York shall be deemed to be your jurisdiction and My Account(s) (as well as the security entitlements with respect to my financial assets credited thereto) shall be governed by the laws of the State of New York.

**22. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**23. Please Complete 23a or 23b as applicable.**

CHICAGO 178720v4 99999-00004

3



**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- If I am not familiar with the mechanics and risks of margin, I should not open a margin account or engage in margin transactions.
- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will debit all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Agreement.

CHICAGO 178720v1 99999-00404                                                                    4

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE AT PARAGRAPH 20.

Signature _____   Date __11/5/01__

Signature _____   Date _____

Signature _____   Date _____

Paragraph 23 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

Deutsche Banc Alex. Brown Inc.

**Deutsche Bank** [logo]

# Account Agreement

JAMES RUTLAND
Name(s)

Deutsche Banc Alex. Brown Inc.

P.O. Box 815
Baltimore, MD 21203

_____
Address

BATON ROUGE        LA
City                State        Zip Code

Account Number

'66  13

IMPORTANT – PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE

In consideration of Deutsche Banc Alex. Brown Inc. (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned (defined below), and agreeing to act as my broker, I agree to the following with respect to each of my Account(s) (defined below) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s)" or the Undersigned" and "My Account(s)" shall mean the account in the name of the undersigned. "You" and "your" refer to Deutsche Banc Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees. Deutsche Banc Alex. Brown is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others provided, however, that Deutsche Bank and its subsidiaries and affiliates shall bear the rights of set-off specifically provided in Paragraph 12. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1.  **Representations**

    Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or suspension of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings association institution, insurance company, investment company, investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above representations change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2.  **Applicable Rules and Regulations**

    All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3.  **Confirmations, Statements and Written Communications**

    I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objections I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger, electronically or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuer of securities which you hold for me.

4.  **Aggregation of Orders and Average Prices**

    I authorize you, in your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5.  **Cash Accounts**

    This paragraph relates to and is effective solely with respect to cash accounts: (i) the undersigned will make full cash payment at or before settlement date for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for or provided in the preceding clause; (iii) the undersigned will sell each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security therefor on or before settlement date; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6.  **Short and Long Orders; Delivery and Settlements**

    I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by me as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated by the delivery of a borrowed security. I also agree that you may, in your discretion, immediately cover any short sale in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you

CHICAGO 178720v4 99999-00094

1

(a) to receive payment for securities I have purchased may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s) with you and any loss resulting therefrom will be charged to such account(s). I authorize you, in your discretion, to request and obtain extension(s) of any time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

**7.  Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8.  Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from any failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9.  Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank AG (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10.  Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11.  Liens**

I hereby grant to you and at sufferance of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you arising under this Account Agreement or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness to any account with you in which I have an interest, and you may, in your discretion, in any time and without prior notice, sell another security any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have no discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12.  Setoff**

I agree that the balance of My Account(s) shall be subject to a lien and a security interest in favor of you, Deutsche Bank AG and all affiliates of Deutsche Bank AG and subject to set off against the Obligations (as defined below) to you, Deutsche Bank AG or any affiliate of Deutsche Bank AG; you, Deutsche Bank AG or any affiliate of Deutsche Bank AG, may at any time or from time to time at your option and without notice, charging the occurrence and during the continuation of a Default or an Event of Default (as such terms are defined in the documents creating the Obligations), appropriate and apply toward the payment of such Obligations that balance of my Account(s); provided, however, that you, Deutsche Bank AG or any affiliate of Deutsche Bank AG, may exercise the foregoing right of set off regardless of the existence of a Default or Event of Default with respect to any payment obligation by you, Deutsche Bank AG or any affiliate of Deutsche Bank AG, to me against any Obligation due to you from me against any Obligation due to you, Deutsche Bank AG or any affiliate of Deutsche Bank AG, from me, whether or not such Obligation is then due and payable. For the purposes of the set off described in this paragraph 12, the term "Obligations" shall be limited to such obligations as I may from time to time and identify in writing to you, Deutsche Bank AG and/or any affiliate of Deutsche Bank AG as an "Obligation" for purposes of this paragraph 12; provided, however, that any such writing setting forth the term Obligations must be mutually agreed to by me and you.

**13.  Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which indicate, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver or by operation of the law or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Upon a default, I will also bear the cost of presuming the value of collateral, including hedging transactions that may be removed at your discretion. Any sales or purchases hereunder may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**14.  Third Party Authorization; No Agency**

If I have authorized any registered investment adviser or other third party to give you instructions with respect to My Account(s) with you, you are authorized to accept from such third party, without inquiry or investigation by you, (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such third party is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such third party, its officers, employees or agents.

**15.  Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**16.  Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable to this account. You may follow the instructions of any of us concerning this account and make delivery to any of us, of any or all property and payment, and all such deliveries and payments shall be made to use of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the

2

survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

17. Foreign Securities

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically found in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

18. Acknowledgment of Possible Conflicts of Interest

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including, without limitation, fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

19. No FDIC Insurance, Not Obligations of Any Bank

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

20. Arbitration

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Prearbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry. I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21203, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

21. Miscellaneous

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between you and me concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement and My Account(s) shall be governed by, and construed in accordance with, the laws of the State of New York. Regardless of any provision in any other agreement, for purposes of the Uniform Commercial Code, New York shall be deemed to be your jurisdiction and My Account(s) (as well as the security entitlements with respect to any financial assets credited thereto) shall be governed by the laws of the State of New York.

22. Paragraph Headings

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

23. Please Complete 23a or 23b as applicable.

[illegible]



CHICAGO 171720v4 99995-00004



PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- If I am not familiar with the mechanics and risks of margin, I should not open a margin account or engage in margin transactions.
- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit interest will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown or pledged or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Agreement.

4

CHICAGO 176720v4 99999-00904

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 20.

Signature _____  Date _____

Signature _____  Date _____

Signature _____  Date _____

Paragraph 23 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Ann. Brown does not receive his certification, it will be required to withhold a portion of all payments to this account.

FOR OFFICE USE ONLY        Branch Manager approval for margin accounts:

Signature _____  Date _____

CHICAGO 178720v4 99999-60004

5